83 F.3d 429
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff/Appellee,
v.
Timothy Ray GLOVER; James Delano Pedrioli, Defendants/Appellants.
 Nos. 95-10194, 95-10198.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Feb. 12, 1996.
Decided April 16, 1996.
 
 1
 Before: HUG, Chief Judge, FERNANDEZ, Circuit Judge, and KELLEHER,* District Judge.
 
 
 2
 MEMORANDUM**
 
 
 3
 Timothy Ray Glover ("Glover") appeals his jury conviction for armed bank robbery in violation of 18 U.S.C. § 2113(a) and (d).
 
 
 4
 James Delano Pedrioli ("Pedrioli") appeals his jury conviction for armed bank robbery in violation of 18 U.S.C. § 2113(a) and (d).
 
 
 5
 We have jurisdiction under 28 U.S.C. § 1291 and we affirm both judgments.
 
 
 6
 Defendants Glover and Pedrioli were charged with one count of armed bank robbery in violation of 18 U.S.C. § 2113(a) and (d). The jury found both defendants guilty. Glover filed a motion for judgment of acquittal and Pedrioli filed a motion for new trial. The district court denied both motions in a written opinion.
 
 
 7
 On April 14, 1994, a man with a handgun robbed the Stockton Savings Bank in Turlock, California. The robber took $9,870.00 from various employees and left the bank. During the robbery, two government witnesses, (the Ruses), drove up to the bank's drive-up window and observed part of the robbery. They trailed the Mercedes for approximately four and a half miles and stopped to call the police with the license number.
 
 
 8
 Using the license number, the police traced the car to Dorothy Pedrioli, the mother of defendant Pedrioli. The police found the car outside the home of Susan Turpitt ("Turpitt"), defendant Glover's sister. The police initiated a traffic stop of the car and found the driver, defendant Glover, who matched the Ruses' description of the getaway driver. In a drive-by show-up, the Ruses identified Glover as the driver of the Mercedes. The Ruses also made a positive identification of Glover in court.
 
 
 9
 After some time, defendant Pedrioli came out of the Turpitt house and the police arrested him. Inside the house, the police found a black Crossman BB pistol which matched the description of the gun given by the bank employees. The gun was in the shelf of the closet of Susan Turpitt's son. During their search, the police also found $4,760.00 in currency in a shoebox on a closet shelf of Susan Turpitt's daughter. This amount was $175.00 short of being exactly half of the money taken in the robbery.
 
 
 10
 Four bank employees identified Pedrioli, from a photographic line-up of six potential suspects, as the bank robber. Two made positive identifications, two made possible identifications. Another employee identified someone other than Pedrioli.
 
 
 11
 Glover contends that there is insufficient evidence for a rational juror to find beyond a reasonable doubt that he aided and abetted either an armed bank robbery or a bank robbery.
 
 
 12
 Glover especially objects to the sufficiency of the evidence regarding his knowledge that the gun was going to be used during the course of the crime. Glover asserts that the evidence which most strongly supports this inference consists of testimony from a government witness which is inconsistent with that witness' earlier comments to the police.
 
 
 13
 Glover further contends that the district court improperly denied his motion for a mistrial after the prosecutor committed misconduct by eliciting testimony from a government witness about Glover's outstanding arrest warrant on an unrelated case and also that co-defendant Pedrioli was a "known armed robber" on parole. Lastly, Glover alleges that his conviction should be reversed because of further prosecutorial misconduct of eliciting statements from an FBI agent indicating that Glover spoke to the agent about Glover's whereabouts on the day of the robbery without disclosing such statements to defense counsel in violation of Fed.R.Crim.P. 16(a)(1)(A).
 
 
 14
 Pedrioli argues that the district court abused its discretion in denying Pedrioli's motion for a mistrial based on the jury's hearing of the inadmissible testimony that Pedrioli was on parole for armed robbery at the time this robbery was committed.
 
 I. GLOVER
 A. SUFFICIENCY OF THE EVIDENCE
 1. Standard of Review
 
 15
 We review the district court's denial of a motion for acquittal de novo. United States v. Riggins, 40 F.2d 1055, 1057 (9th Cir.1994). The proper analysis is that used in a review of the sufficiency of the evidence. United States v. Shirley, 884 F.2d 1130, 1133 (9th Cir.1989). We evaluate the evidence presented against the defendant in a light most favorable to the government to determine whether " 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " Riggins, 40 F.3d at 1057 (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). "All reasonable inferences from the facts must be drawn in favor of the government." United States v. Andrino-Carillo, 63 F.3d 922, 924 (9th Cir.1995).
 
 
 16
 Circumstantial evidence and inferences drawn from it may support a conviction. United States v. Jackson, 72 F.3d 1370, 1381 (9th Cir.1995). However, mere suspicion or speculation is not sufficient. United States v. Dinkane, 17 F.3d 1192, 1195 (9th Cir.1994). "The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict." United States v. Mares, 940 F.2d 455, 458 (9th Cir.1991) (citations omitted).
 
 2. The Armed Bank Robbery
 
 17
 Glover was convicted as a principal for aiding and abetting another in committing an armed robbery. A conviction of armed bank robbery under 18 U.S.C. § 2113(d) requires that the defendant committed an unarmed bank robbery in violation of § 2113(a) and also committed the aggravating behavior--endangering the life of any person by the use of a dangerous weapon or device--as described in § 2113(d). To be liable as a principal for helping another to commit a crime, the defendant must knowingly and intentionally help the principal in every essential element of the crime. Dinkane, 17 F.3d at 1196. The defendant must give his assistance during the commission of the crime. Id.
 
 
 18
 Dinkane sets out the government's burden of proof in securing a conviction of a getaway car driver for aiding and abetting an armed bank robbery:
 
 
 19
 The government must show that the defendant knowingly and intentionally aided the commission of the aggravating element: assaulting a person or putting a life in jeopardy before or during the commission of that aggravating element. If the aiding and abetting of the underlying offense occurs only after the aggravating use of a dangerous weapon has ended, the defendant cannot be shown to have aided and abetted an essential element of armed bank robbery and therefore cannot be convicted of the greater offense.
 
 
 20
 Id. at 1197 (emphasis added).
 
 
 21
 In Dinkane, we considered the sufficiency of the evidence supporting defendant's conviction of aiding and abetting an armed bank robbery for his role as a getaway driver. We vacated the conviction, holding that the government failed to prove beyond a reasonable doubt that the defendant helped in the principals' use of dangerous weapons during the robbery. We found that "[t]here was no evidence that prior to the robbery [the defendant] Dinkane knew that the principals had and intended to use weapons." Id.[1]
 
 
 22
 Relevant to our analysis in Dinkane was the fact that the jury received the following instruction, which the government later conceded was incorrect: "The government is not required to show that the defendant actually knew that a dangerous weapon would be used." Id. We concluded that no properly instructed jury could have reasonably found the defendant guilty of armed bank robbery. Id.
 
 
 23
 On the day of the robbery, Turpitt told the police that the gun found in her house did not belong to her son. At trial, she testified for the government and stated that she later learned that her son did own that gun. The jury heard this testimony and also learned of Turpitt's initial statement to the contrary. After Turpitt testified, the prosecutor argued in summation that Turpitt lied about her son owning the BB gun.
 
 
 24
 On appeal, the Government urges that the jury may have believed Turpitt's trial testimony about her son's ownership of the gun. Thus, the government argues, the jury may have readily concluded that Glover took the gun from his nephew's bedroom sometime before the robbery, provided it to Pedrioli to use, and returned it to the bedroom upon Glover's return to the house after the robbery. This argument is important, because it links Glover to the gun and supports the inference that Glover must have known of the gun use before or during the robbery, as required by Dinkane.
 
 
 25
 Glover argues that we cannot or ought not consider Turpitt's testimony about her son's owning the gun as part of the evidence used to prove Glover's knowledge of the aggravating behavior. Glover contends that after the prosecutor discredited the Turpitt testimony during closing argument, the government may not now rely on this same testimony as a basis for sustaining the jury's verdict. Glover also asserts that this Court should in any case disregard the Turpitt testimony as "inherently unbelievable."
 
 
 26
 We first address the issue of whether and how we should consider the Turpitt testimony and then decide whether the evidence before us supports the conviction under the Dinkane standard.
 
 
 27
 We reject Glover's argument that we should construe the government's disparaging of the testimony as a judicial admission. Glover improperly relies on United States v. Bentson, 947 F.2d 1353, 1356 (9th Cir.1991), cert. denied, 504 U.S. 958 (1992). In Bentson, this Court found that the defendant was bound on appeal by his attorney's closing statement before the district court because that statement constituted a judicial admission. We determined that the attorney conceded that the defendant did not file valid tax returns when the attorney stated that the defense did not suggest that valid returns were filed. Id. at 1356.
 
 
 28
 It does not appear to us that the prosecutor's interpretation of the testimony of Ms. Turpitt and argument urging the jury to adopt this interpretation constitute a judicial admission on behalf of the government. Whatever the government's version of the testimony, the jury may still have disregarded it and believed Turpitt.
 
 
 29
 We also reject Glover's suggestion that we should disregard the testimony because it is "inherently unbelievable." Decisions finding testimony "inherently unbelievable" involve testimony which is physically or logically impossible. See, e.g., United States v. Ramos-Rascon, 8 F.3d 704, 708 (9th Cir.1993) ("It simply defies logic to believe that a law enforcement agent can observe the extra degree of awareness the officer described here under these circumstances."); see also United States v. Saunders, 973 F.2d 1354, 1359 (7th Cir.1992) ("We must accept the evidence unless it is contrary to the laws of nature ... or is so inconsistent or improbable on its face that no reasonable fact finder could accept it.") (citations omitted).
 
 
 30
 If we construe Turpitt's trial testimony as contradicting an earlier statement, the reliability of her testimony is impacted. Nevertheless, the testimony is still far from preposterous and so should not be disregarded on the "inherently unbelievable" basis.
 
 
 31
 In any case, we find that Ms. Turpitt's testimony at trial was not really inconsistent. At the time Ms. Turpitt made her first statement denying knowledge of the gun, she may well not have known that her son owned the gun. Ms. Turpitt may have first learned that the gun did, in fact, belong to her son in later talking to him and so testified at trial.
 
 
 32
 We conclude that we may and will consider Turpitt's testimony in evaluating the sufficiency of the evidence. We also believe that the totality of the Government's evidence connected the gun to Glover and allowed the jury to conclude that he must have known about the gun's use. Two witnesses identified Glover as the driver of the getaway car from an alley near the bank. Evidence showed that the car belonged to the mother of co-defendant Pedrioli. Glover was arrested in the same car as he drove away from his sister's home. The man identified as the robber, Pedrioli, was also found in this house. Most importantly, with respect to the aiding and abetting conviction, the police found a Crossman BB pistol in the bedroom of Glover's nephew. Several witnesses identified this pistol as identical to the weapon used in the bank robbery. Glover's sister, Turpitt testified that the gun belonged to her son. In the same house, the police found almost exactly one-half of the $9870 taken in the robbery. The finding of the money at this house and especially the amount of the money are important circumstantial facts implicating Glover and also associating him with the gun.
 
 
 33
 Glover urges that the evidence does not exclude and even supports the conclusion that Pedrioli, rather than Glover, dropped off the gun at Glover's sister's home.
 
 
 34
 We acknowledge that the evidence tending to prove Glover's knowledge of the gun use does not eliminate all other alternatives. Nevertheless, the elimination of all other alternatives is not our standard for sufficiency of the evidence. See Mares, 940 F.2d at 458. The above possibilities are hypothetical exculpatory explanations which the jury is under no duty to draw from the evidence. The jury concluded that the sum of all uncertainties did not rise to the level of reasonable doubt as to their conclusion that Glover must have known about the gun. Although a different jury may have decided differently, this Court must only interfere with the jury's conclusion if no rational or reasonable jury would convict on these facts.
 
 
 35
 In summary, we hold that there is sufficient evidence linking Glover to the gun use in the robbery and establishing that he knew about it before the crime.
 
 
 36
 3. The Unarmed Bank Robbery.
 
 
 37
 We reject Glover's assertion that there was insufficient evidence of his knowingly aiding and abetting a bank robbery as the getaway car driver. The government presented sufficient evidence for a reasonable jury to conclude that Glover knew he was helping Pedrioli rob a bank. Eyewitnesses identified Glover as the driver of the Mercedes used as the getaway car. As the robbery took place, the Mercedes was parked in an alley near the bank rather than in the bank parking lot. The police found almost half of the money taken from the bank and the weapon identified as the one used by the robber in Glover's sister's home. The man identified as the robber was also there and the Mercedes belonged to that man's mother. A reasonable jury could find this evidence to prove beyond a reasonable doubt that Glover knew he assisted a robbery.
 
 
 38
 B. DENIAL OF MOTION FOR MISTRIAL ON GROUNDS OF INADMISSIBLE TESTIMONY AND PROSECUTORIAL MISCONDUCT
 
 1. Standard of Review
 
 39
 We review the district court's denial of a motion for mistrial or a new trial for an abuse of discretion. United States v. George, 56 F.3d 1078, 1082 (9th Cir.1995).
 
 2. Prosecutorial Misconduct
 
 40
 To successfully move for a new trial based on prosecutorial misconduct, a defendant must show that it is "more probable than not that the [prosecutorial] misconduct materially affected the verdict." United States v. Hinton, 31 F.3d 817, 824 (9th Cir.1994) (citing to United States v. Christophe, 833 F.2d 1296, 1301 (9th Cir.1987). Reversal will only be necessary if the alleged prosecutorial misconduct actually deprived the defendant of a fair trial. United States v. Yarbrough, 852 F.2d 1522, 1539 (9th Cir.1988), cert. denied, 488 U.S. 866, 109 S.Ct. 171, 102 L.Ed.2d 140 (1988). The prosecutor's alleged misconduct must be evaluated in the context of the entire trial. Id. We find significant and may defer to the trial court's view of the prosecutor's conduct. United States v. Sanchez-Robles, 927 F.2d 1070, 1077 (9th Cir.1991) (quotation omitted).
 
 
 41
 We reject Glover's claim of prosecutorial misconduct. The record shows that the prosecutor did not elicit the improper testimony. With respect to the outstanding warrant for Glover's arrest, the prosecutor attempted to stop the detective from elaborating about the warrant. Moreover, Pedrioli's counsel conceded that the prosecutor's question to McNeff did not prompt the answer regarding Pedrioli's parole status.
 
 3. Inadmissible Testimony
 
 42
 Even if we find that the prosecutor did not intentionally act improperly, we must assess whether the conduct affected the outcome of the trial. "The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips, 455 U.S. 209, 219, 102 S.Ct. 940, 947 (1982).
 
 
 43
 In any case, in his prosecutorial misconduct argument, Glover implicitly argues that the trial court erred in concluding that the inadmissible evidence was not sufficiently prejudicial so as to require a mistrial or a new trial. Glover takes issue with the comment about the warrant, the Pedrioli parole testimony, and also with the adequacy of the instruction in addressing the prejudice.
 
 
 44
 The improper admission of evidence mandates reversal unless the reviewing court can say with "fair assurance" that the error did not influence the verdict. United States v. Brooke, 4 F.3d 1480, 1488 (9th Cir.1993).[2]
 
 
 45
 a. Speckman Warrant Testimony
 
 
 46
 In support of his argument, defendant refers to several of our cases involving the improper admission of testimony or physical evidence by the court. See, e.g., United States v. Brooke, 4 F.3d 1480, 1488 (9th Cir.1993); see also United States v. Guerrero, 756 F.2d 1342, 1347 (9th Cir.1984), cert. denied, 469 U.S. 934 (1984); United States v. Lehay, 272 F.2d 487 (9th Cir.1959); United States v. Bradley, 5 F.3d 1317 (9th Cir.1994).
 
 
 47
 The above authorities are factually inapposite to the matter before us today.[3] In this case, the district court did not allow the jury to consider the improper testimony in reaching their verdict as to Glover. The court immediately struck the offending testimony about the warrant and later gave a curative instruction with respect to all of the improper evidence.
 
 
 48
 Even if we treat the testimony about Glover's outstanding warrant as improper admission of bad character evidence causing some prejudice to the defendant, reversal does not automatically result. We may affirm the conviction where the lower court gave an admonishment to the jury and there is strong evidence of defendant's guilt. United States v. Aichele, 941 F.2d 761 (9th Cir.1991) (citing to United States v. Johnson, 618 F.2d 60, 62 (9th Cir.1980)).
 
 
 49
 We explained in Aichele,: "If the case against a defendant is very strong, though not overwhelming, and the reviewing court is unconvinced that the admission of the evidence influenced the outcome of the case, the court may uphold the verdict." Id. Glover urges that in Aichele, the prejudice to the defendant was much less significant and the government's case was much stronger than in his case. In Aichele, the inadmissible testimony was about the one time defendant was in prison in 1964, about 25 years before the trial.
 
 
 50
 Although testimony about an outstanding warrant would be more prejudicial than the testimony in Aichele, our analysis does not stop here. We consider the prejudice in the context of the government's case. The government's case against Glover is quite powerful. The circumstantial evidence and the witness identifications of Glover as the driver constitute strong evidence tending to show that Glover was a participant in the robbery. As we discussed and concluded above, there is also sufficient evidence to conclude that Glover knew he was helping the use of a gun. Moreover, each time Speckman mentioned the warrant, he did not finish his sentence, and the testimony was not admitted into evidence.
 
 
 51
 b. McNeff Parole Testimony
 
 
 52
 Glover also argues that the Pedrioli parole testimony was extremely prejudicial to Glover's case. He reasons that the jury now linked Glover with an accomplice, who the jury heard was on parole for the same crime for which the jury now tried Glover. However, the evidence against Pedrioli was very strong--it included the use of his mother's car as the getaway vehicle, Pedrioli's presence at the house of the sister of the person identified as the driver of that car, and the identification of Pedrioli by four employees. The court also instructed the jury to disregard the McNeff comment.
 
 
 53
 c. The Jury Instruction
 
 
 54
 Glover contends that the jury instruction failed to alleviate and even aggravated the prejudice caused by the evidence erroneously presented to the jury.
 
 
 55
 The court instructed the jury as follows, in relevant part: "Ladies and gentlemen, just prior to the noon hour, you heard some testimony relating to criminal acts by the defendant and a violation of parole. You are admonished and instructed to disregard that testimony." Glover asserts that the court erroneously spoke of a "violation of parole" and of "criminal acts," when the testimony only informed the jury about an outstanding arrest warrant and about parole.
 
 
 56
 Neither defendant objected to the instruction during the trial. Glover explains that any objection would have drawn more attention to the fact that there was an outstanding warrant.
 
 
 57
 Nonetheless, when a defendant fails to object to the instruction at trial, we review the instruction for plain error. United States v. Ponce, 51 F.3d 820, 830 (9th Cir.1995). Reversal is warranted only when "viewing the error in the context of the entire record, the impropriety 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings, or where failing to reverse a conviction would amount to a miscarriage of justice.' " United States v. Necoechea, 986 F.2d 173 (9th Cir.1993). We have the authority, but are not required, to correct a forfeited error which is "plain" and "affect[ing] substantial rights." United States v. Olano, 507 U.S. 725, 113 S.Ct. 1770, 1779 (1993).
 
 
 58
 After weighing all the relevant factors and considering especially the strength of the government's case, we have a "fair assurance" that neither the Speckman statements about the warrant nor the McNeff comment about Pedrioli's parole influenced the jury's verdict as to Glover. We also find that the instruction did not amount to plain error which we must recognize to prevent a miscarriage of justice.
 
 
 59
 4. Prosecutor's Failure to Disclose Defendant's Statement to
 
 Defense Counsel
 
 60
 On the day of his arrest, Glover made a statement to government Agent Scott. Inadvertently, this statement was not produced to defendant until Agent Scott was on the stand. As a sanction for the untimely production, the district judge barred the government from using the statement for any purpose.
 
 
 61
 We review for abuse of discretion the district court's choice of remedy for violation of a discovery order. United States v. Jennings, 960 F.2d 1488, 1490 (9th Cir.1992). The trial court may exercise wide discretion in choosing a sanction for violation of Fed.R.Crim.Pro. Rule 16(a)(1)(A). United States v. Burgess, 791 F.2d 676, 681 (9th Cir.1986). In Burgess, we found that suppression of a defendant statement not produced in discovery prevented prejudice and failure to impose a more severe sanction was not an abuse of direction. Id.
 
 
 62
 Glover chose not to make the statement part of the record and it is not before us. Glover has not shown how the government's failure to produce this statement prejudiced the preparation or presentation of his defense. He contends that the statement is incriminating only because the jury heard that the defendant made a statement about his whereabouts without ever learning what that statement was due to a defense objection.[4]
 
 
 63
 There is no testimony that Glover responded to Agent Scott's question in any way and certainly no testimony suggesting that he responded with some incriminating information. Defendant reaches too far when he argues that the simple knowledge on the part of the jury that the agent had a discussion with Glover concerning Glover's whereabouts is incriminating to Glover.
 
 
 64
 Accordingly, we find that the district court properly exercised its discretion in choosing the sanction.
 
 5. Cumulative Error Claim
 
 65
 Finally, Glover summarily contends that the prejudice from the jury learning that he made some unspecified statement about his whereabouts adds to the prejudice caused by the other errors in the case. Glover appears to argue that cumulative error occurred.
 
 
 66
 Even if no individual error rises to the level of reversible error, the cumulative effect of errors may be so prejudicial as to mandate reversal. Necoechea, 986 F.2d at 1282. In reviewing for cumulative error, we review all plain errors and all errors preserved for appeal. Id. We also consider whether any "traces" remain from an error cured by instruction. Id.
 
 
 67
 We have in the past declined to apply the cumulative error analysis when we found that defendant pointed to no errors in the proceedings. See United States v. Gutierrez, 995 F.2d 169, 173 (9th Cir.1993) (defendant who failed to establish single error in the admission of evidence has no basis for asserting cumulative error in receiving evidence).
 
 
 68
 Glover's statement was suppressed before it was used and no information about the existence of the statement or its content went to the jury. Accordingly, there was no error on that issue. Nevertheless, because "traces" may remain from Speckman's testimony about the warrant and McNeff's testimony about Pedrioli's parole, we will consider whether these "traces" amount to cumulative error.
 
 
 69
 The court's rulings on these evidentiary matters individually is subject to non-constitutional harmless error analysis.[5] Therefore, we affirm if we have a "fair assurance" that the cumulative error did not influence the verdict. United States v. Berry, 627 F.2d 193, 201 (9th Cir.1980) (using "more probably than not" standard to analyze for cumulative non-constitutional error).
 
 
 70
 The trial court admonished the jury and struck the evidence. The government presented a very strong case. We find that any lingering prejudice from the cured errors was minimal and did not affect the jury's verdict as to Glover.
 
 II. PEDRIOLI
 A. DENIAL OF MOTION FOR MISTRIAL
 1. Standard of Review
 
 71
 We review the trial court's denial of a motion for mistrial for an abuse of discretion. United States v. George, 56 F.3d 1078, 1082 (9th Cir.1995). We apply the "fair assurance" standard, discusses at length above, in evaluating any improper admission of evidence. Brooke, 4 F.3d at 1488.
 
 
 72
 2. Inadmissible Testimony and Curative Instruction
 
 
 73
 Detective McNeff volunteered the information that Pedrioli was a "known bank robber" who was "on parole at the time" of the subject bank robbery. As we noted above, these remarks constitute improper prior bad conduct evidence and are inadmissible against Pedrioli. Again, the record indicates and defendant's counsel acknowledged that the prosecutor did not elicit the testimony in bad faith. The court struck the McNeff testimony and told the jury to disregard it.
 
 
 74
 We reject Pedrioli's contention that the impact of the offending testimony was so highly prejudicial when measured against the "frailty" of the government's case as to mandate a reversal of the conviction.
 
 
 75
 When the district court cures the error and there is strong evidence of defendant's guilt, we are not required to reverse a conviction even it the inappropriate remarks result in some prejudice to the defendant. United States v. Yarbrough, 852 F.2d at 1539 (citing United States v. Parker, 549 F.2d 1217, 1221 (9th Cir.1977), cert. denied, 430 U.S. 971 (1977). The Aichele case, discussed above, guides our analysis. "If the case against the defendant is very strong, though not overwhelming, and the reviewing court is unconvinced that the admission of the evidence influenced the outcome of the case, the court may uphold the verdict." Aichele, 941 F.2d at 765.
 
 
 76
 We acknowledge that the McNeff remark, despite the fact that it was not admitted into evidence and may have been cured by the jury instruction, still may have resulted in some prejudice to Pedrioli. Nevertheless, we find that the circumstantial evidence against Pedrioli and the eyewitness identification made a very strong case for the government.[6] For the jury to find that defendant was not involved in the robbery, the jury would have to find the following facts as coincidences: four employees mistakenly pick defendant out of a photo lineup; defendant's mother's car was used as the getaway vehicle; defendant was in the company of the driver of the getaway car when arrested; defendant was at the home of the sister of the getaway driver, whom he never met before; the police found money and a weapon related to the robbery inside the house where defendant was found.
 
 
 77
 We also consider relevant the district court's view of the context of the error in determining whether the district court abused its discretion in denying the motion for mistrial. See United States v. Sanchez-Robles, 927 F.2d at 1077. The district court considered the impact of the McNeff remark after hearing nearly all of the evidence regarding the robbery and chose the remedy of admonishing the jury. This was not an improper course to follow.
 
 
 78
 We conclude that the district court did not abuse its discretion in finding insufficient prejudice to have necessitated a mistrial or requiring a new trial.
 
 B. THE JURY INSTRUCTION
 
 79
 Pedrioli also contends that the district court's admonishment to the jury to disregard the remarks of Detective McNeff confirmed the accuracy of that testimony and further prejudiced defendant's right to a fair trial.
 
 
 80
 Pedrioli's attorney inquired if he could suggest a proper instruction and the court responded in the affirmative. However, counsel never suggested an instruction. Accordingly, because the defendant did not object, we review the jury instruction only for plain error. Arias-Villanueva, 998 F.2d 1491.
 
 
 81
 We concluded above that the district court's instruction did not constitute plain error as to Glover. For similar reasons, especially given the strength of the case against Pedrioli, we find that the jury instruction was not a "plain error" "affecting substantial rights" as to Pedrioli. After considering the strength of the government's case, we find that the improper testimony, not admitted for consideration by the jury, did not influence the outcome of Pedrioli's case.
 
 
 82
 AFFIRMED.
 
 
 
 *
 The Honorable Robert J. Kelleher, Senior United States District Judge for the Central District of California, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 The government's evidence consisted of the following: Dinkane participated in the planning of the robbery by casing the bank prior to the robbery and by conferring with the others in the parking lot; Dinkane waited in the car during the robbery; the three robbers had weapons; Dinkane knew the principals had used guns at the time he assisted the escape because they ran out of the bank with their guns drawn; and Carmichael, Dinkane's accomplice, testified that he (Carmichael) was armed when Dinkane joined the group before the robbery. There was no testimony that the robbers openly carried guns until they were entering the bank. There was also no testimony about whether Dinkane did see or could have seen Carmichael's gun. Id. at 1197-98
 
 
 [2]
 When evidence is erroneously presented to the jury, this Court has required the government to show that the prejudice resulting from the error was more probably than not harmless. United States v. Vgeri, 51 F.3d 876, 882 (9th Cir.1995); United States v. Rahm, 993 F.2d at 1415 (9th Cir.1993); United States v. Lui, 941 F.2d 844, 848 (9th Cir.1991); United States v. Browne, 829 F.2d 760, 766 (9th Cir.1987), cert. denied, 485 U.S. 991 (1988)
 This Court has also described the test for nonconstitutional error as requiring a "fair assurance" that the error did not have "substantial influence" over the verdict. See United States v. Webbe, 755 F.2d 1387, 1389 (9th Cir.1985); see also United States v. Tory, 52 F.3d 207, 211 (9th Cir.1995) (applying both tests); United States v. Breitkreutz, 8 F.3d 688, 692-93 (9th Cir.1993) (noting potential conflict); Rahm, 993 F.2d at 1415 n. 5 (same); United States v. Hitt, 981 F.2d 422, 425 & n. 2 (9th Cir.1992) (same).
 We have explained that no conflict between these two formulations of the standard can or does exist. United States v. Brooke, 4 F.3d 1480 (9th Cir.1993). The standard is the "fair assurance" standard established by the Supreme Court in Kotteakos v. United States, 328 U.S. 750 (1946). The "more probable than not" standard is an alternative way of describing the same. Id. at 1488.
 
 
 [3]
 In Guerrero, this Court found that the district court properly failed to declare mistrial after admitting other crimes testimony because the error did not materially affect the verdict. In Brooke, Lehay, and Bradley, we concluded the trial court erroneously admitted evidence and only then applied the harmless error analysis. In Bradley, the district court admitted prior bad conduct evidence and gave a limiting instruction that the evidence would only be considered to prove motive
 In United States v. Manarite, 44 F.3d 1418 (9th Cir.), cert. denied, 132 L.Ed.2d 854 (1995), the defendant's parole status was allowed into evidence with a limiting instruction from the district judge. This Court found that the judge did not abuse his discretion, even though we wrote that "revelations of the defendant parole status might provoke a mistrial because it would inform the jury that the defendant had a prior criminal history". Id. at 1418 (quotation omitted).
 
 
 [4]
 The jury heard only the following about the statement:
 "Q: Your discussions with Mr. Glover that afternoon, did you ask him about his whereabouts on the morning of April 14?
 A: Yes, I did."
 
 
 [5]
 The jury instruction is subject to plain error analysis. However, Glover charges cumulative error with respect to the Speckman testimony, the McNeff testimony, and the allegedly incriminating statements of Agent Scott. In any case, we previously found that the jury instruction did not amount to plain error
 
 
 [6]
 The government points out that although the bank witnesses were limited in their ability to observe defendant's face, each witness found Pedrioli's eyes distinctive